O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GERARD REDMOND ENRIGHT, JR., | ) | CASE NO. CV 07-06598 AHS (SH) |
| Plaintiff, | ) | |
| | ) | REPORT AND RECOMMENDATION |
| vs. | ) | OF UNITED STATES MAGISTRATE |
| | ) | JUDGE |
| THE CITY OF TORRANCE, DOES 1 | ) | |
| THROUGH 99, INCLUSIVE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This Report and Recommendation is submitted to the Honorable Alicemarie H. Stotler, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.  For the reasons stated below, Defendant's Motion for Judgment on the Pleadings should be granted, and the action dismissed.

## BACKGROUND

### A.    PROCEDURAL BACKGROUND

Pro se Plaintiff Gerard Redmond Enright, Jr., asserts civil rights claims pursuant to 42 U.S.C. § 1983 arising from events that occurred on October 10, and 12-13, 2005, when officers of the City of Torrance arrested him, searched his home, confiscated hundreds of rescued birds, condemned his house and detained him for psychiatric evaluation.  Plaintiff

filed his Complaint on October 11, 2007, asserting fifty-five claims under state and federal law.   Plaintiff sues the City of Torrance and Doe defendants 1 through 99.[1]  [Complaint ("Cpt.") 18-19.]  Plaintiff seeks declaratory relief, injunctive relief, compensatory and punitive damages, costs and attorney fees, and he requests that the court refer any criminal activities that come to the court's attention in connection with this suit to the District Attorney's Office for prosecution.  [Cpt. 80-82.]

On December 26, 2007, Defendant City of Torrance filed an Answer.   On September 8, 2008, Defendant filed an Amended Notice of Motion and Motion for Judgment on the Pleadings ("MJP").  On October 16, 2008, Plaintiff filed an Opposition to Defendant's Motion for Judgment on the Pleadings ("Opp."), and on October 20, 2008, Defendant filed a Reply.[2]

**B.    FACTUAL ALLEGATIONS**

The following factual allegations are taken from Plaintiff's Complaint.   On October 10, 2005, while Plaintiff was working on the front porch of his home, two Torrance police officers assigned to the Animal Control Division of the Torrance Police Department ("Doe 1" and "Doe 2"), approached him and insisted that Plaintiff permit them to enter and inspect Plaintiff's back yard.  [Cpt. 20-21.]  Plaintiff permitted them to do so solely because they threatened to arrest him.  After inspecting the back yard, the officers

---

[1]   With the exception of the City of Torrance, Plaintiff sues all of the individual defendants who allegedly violated his rights as Doe defendants, but he has not identified any of them despite having conducted discovery since filing his Complaint over one year ago.  While it is permissible to use Doe defendant designations to refer to defendants whose names are unknown to Plaintiff in the Complaint, using Doe defendants creates its own problem: those persons cannot be served with process until they are identified by their real names.  The burden is on the plaintiff to investigate the names and identities of unnamed defendants.  Regardless, however, the Complaint in this case should be dismissed in its entirety, as discussed below.

[2]   Defendant also filed a Motion to Dismiss (for failure to comply with the court's discovery order), on September 8, 2008.  Plaintiff filed an Opposition on October 16, 2008, and Defendant filed a Reply on October 20, 2008.  Defendant's Motion to Dismiss should be denied as moot in light of the grant of Defendant's Motion for Judgment on the Pleadings, discussed below.

commanded Plaintiff to permit them to enter and inspect the interior of his home.  [Cpt. 21.]

After Plaintiff refused for the third time, a marked Torrance police vehicle appeared in front of his home, and a uniformed female officer ("Doe 3") exited and approached Plaintiff's front porch.  The officer grabbed Plaintiff's right forearm while reaching for her handcuffs with her other hand.  She explained that she intended to arrest Plaintiff if he did not agree to permit the officers to enter his home.  [Cpt. 21-22.]  Plaintiff felt extreme pressure and concern for his rescued birds, six of which he had brought out on the front porch for sun exposure, and which could be threatened by marauding cats, dogs, raccoons, or passers by if he were taken to jail.  Several more birds were kept indoors, due to be fed by syringe within the next half-hour.  [Cpt. 22-23.]

Believing that he had no alternative, Plaintiff permitted Doe 1, an animal control officer, to enter his home.  [Cpt. 26.]  Plaintiff had not permitted anyone into his home in over a decade.  At the conclusion of the search, Doe 1 stated to Plaintiff that he could see that all of the birds were adequately provisioned with food and water, and informed Plaintiff that he was the person Plaintiff would have to deal with to seek a waiver of the City of Torrance's four-bird limit.  [Cpt. 26.]  The officer further stated that if Plaintiff was cooperative, he would work with him to determine the number of birds he would be permitted to keep.  [Cpt. 27.]

On October 12, 2005, Doe 1 arrived at Plaintiff's home along with seven Torrance Police patrol cars, several animal control vehicles, and more than twenty individuals ("Does 41 through 80").  [Cpt. 30.]  Doe 1 informed Plaintiff that he was under arrest for felony animal cruelty, handcuffed him, and shoved him into the back of a patrol vehicle.  [Cpt. 30-31.]  The officer told Plaintiff that the birds would be transported to Carson Animal Shelter for health testing purposes.  Plaintiff was taken to jail and then released when a friend posted twenty thousand dollars bail.  [Cpt. 32-33.]

Plaintiff's friend drove him home.  As they approached Plaintiff's home, they observed that the street had been barricaded with yellow tape starting two houses from

Plaintiff's house and on a portion of a street adjoining Plaintiff's street, and a large mobile tactical control trailer had been parked adjacent to the curb of the house next door to Plaintiff's house.   Plaintiff stepped under the yellow tape and approached his house.  He was met by Doe 1 about one hundred feet from his driveway. When Plaintiff inquired about his birds, the officer told Plaintiff that he would never be seeing his birds again. [Cpt. 38.] Another officer then escorted Plaintiff out under the yellow tape and told him that he would be re-arrested on different charges if he crossed under the yellow tape again.

Plaintiff observed several non-uniformed officers doing something in his driveway with hypodermic syringes, but when he asked who they were and what they were doing, another uniformed Torrance police officer ("Doe 4") forcefully extended his arm in front of Plaintiff's face and commanded Plaintiff to stop speaking to those individuals. [Cpt. 39-40.]

While Plaintiff was speaking with neighbors and a news reporter from a local newspaper, one of the uniformed police officers approached and asked Plaintiff to walk away with her.  Once they had reached a secluded location out of the view of the neighbors and the reporter, armed officers (Doe 3 and Doe 5) handcuffed Plaintiff, forced him in a police vehicle and transported him to a UCLA emergency psychiatric facility in East Torrance. [Cpt. 42-43.] Plaintiff's handcuffs were uncomfortably tight and he felt panicky and feared for his life.  At the psychiatric facility, one of the officers told him that they were checking him into the facility for a seventy-two hour observation.  Plaintiff's repeated requests to have his handcuffs loosened were met with the response that Plaintiff "would be alright." [Cpt. 43.]

After about twenty minutes, the handcuffs were removed and two doctors questioned Plaintiff.  At the conclusion of the questioning, the doctors promptly had Plaintiff released and contacted his friend to come and pick him up from the facility.  Plaintiff was escorted into a small conference room where his friend was seated, looking uncharacteristically nervous.  A few minutes later, one of the doctors who had questioned Plaintiff informed

him that all of his birds had been killed "by injection with alcohol," except for one named Twister.  [Cpt. 44.]

Plaintiff and his friend drove back to his house at about 9:30 p.m. and discovered that his driveway was being guarded by an armed Torrance Police officer.  Many animal carriers and cages had been stacked in front of his house, and unknown individuals were boarding up the house.  [Cpt. 48.]

On the morning of October 13, 2005, Plaintiff returned to his home and discovered that his yard was littered with water bottles and contaminated protective paraphernalia.  A "No Entry" sign had been posted on his house and boards had been nailed to his wooden window shutters and screwed into his door frames.  A locked refrigerator in Plaintiff's garage had been ripped open, and various cabinets and other structures had been forced open, with contents scattered around.  Plaintiff's car had been ransacked and left open and exposed to the weather.  Deceased birds that Plaintiff kept refrigerated and preserved in alcohol for study and diagnosis, were all missing, along with various tools, instruments, vaccines, antibiotics, antifungals, antiseptics, medications, sprays, and other items.  Two live pigeons had been left inside the boarded-up house.  Many lights and Plaintiff's computer had been left on.  Files had been erased from his computer's hard drive. Cupboards, drawers and cabinets had been ransacked, with contents strewn around the house.  Items and records had been destroyed and taken, and five thousand dollars in cash that had been at the rear of a drawer in Plaintiff's desk, was missing.  [Cpt. 50-55.]

Plaintiff discovered that Torrance Police Department officials ("Does 21 through 30") distributed a press release containing false information that Plaintiff's bank accounts would be attached, and that Plaintiff would be billed for the cost of the entire operation and clean-up, and would never return to his home.  The local newspaper, the Daily Breeze, printed misinformation and exaggerations, and ran front-page photographs of Plaintiff, for three days, beginning with Plaintiff's initial arrest. [Cpt. 65-66.]

## DISCUSSION

### A.    STANDARD OF REVIEW

A Rule 12(c) motion for judgment on the pleadings should be granted when, taking all material allegations in a complaint as true and construing them in the light most favorable to the nonmoving party, the moving party demonstrates that it is entitled to judgment as a matter of law.  Geraci v. Homestreet Bank, 347 F.3d 749, 751 (9th Cir. 2003) ( "A motion for judgment on the pleadings should be granted where it appears the moving party is entitled to judgment as a matter of law."); Honey v. Distelrath, 195 F.3d 531, 532 (9th Cir. 1999) ("Judgment on the pleadings is proper when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law."); Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298, 1301 n.2 (9th Cir. 1992)  ("In reviewing the defendants' motions under FED. R. CIV. P. 12(c), the district court views the facts as presented in the pleadings in the light most favorable to the plaintiffs, accepting as true all the allegations in their complaint and treating as false those allegations in the answer that contradict the plaintiffs' allegations.").

Where FED. R. CIV. P. 12(c) is used to raise the defense of failure to state a claim, the motion for judgment on the pleadings faces the same test as a motion under Rule 12(b)(6).  A "complaint . . . must contain either direct or inferential allegations respecting all material elements necessary to sustain recovery under some viable legal theory"; otherwise, it is subject to dismissal for failure to state a claim.  See Bell Atlantic Corp. v. Twombly, 550 U.S. 546, 127 S. Ct. 1955, 1969, 167 L. Ed. 2d 929 (2007).  Federal Rule of Civil Procedure 12(b)(6) and 12(c) are "functionally identical," with the principal difference being the time of filing.  Dworkin v. Hustler Magazine Inc., 867 F.2d 1188, 1192 (9th Cir. 1989).  Both types of motions permit challenges directed at the legal sufficiency of the parties' allegations.  The same standard thus applies to both motions. Sprint Telephony PCS, L.P. v. County of San Diego, 311 F. Supp. 2d 898, 902 (S. D. Cal. 2004) (citing Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir. 1989) (stating standard for motion for judgment on the pleadings) and Balistreri

1  v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988) (stating standard for motion to

2  dismiss for failure to state a claim)); see also Patel v. Contemporary Classics of Beverly

3  Hills, 259 F.3d 123, 126 (2d Cir. 2001)("The standard for granting a Rule 12(c) motion for

4  judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state

5  a claim.").  In deciding this motion, not only must the court accept all material allegations

6  in the complaint as true, but it also must construe the complaint, and resolve all doubts, in

7  the light most favorable to Plaintiff.

8

9  **B.   MUNICIPAL LIABILITY**

10         Defendant asserts that Plaintiff has not pled any facts to suggest that any of the

11  conduct alleged was pursuant to a custom, practice, or policy, and therefore has not alleged

12  a cognizable claim of municipal liability.  [MJP 12.]  Defendant is correct.

13         A local government entity "may not be sued under § 1983 for an injury inflicted

14  solely by its employees or agents.  Instead, it is only when execution of a government's

15  policy or custom, whether made by its lawmakers or by those whose edicts or acts may

16  fairly be said to represent official policy, inflicts the injury that the government as an entity

17  is responsible under § 1983." Monell v. Dep't of Soc. Servs. of the City of New York, 436

18  U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); see also Board of County Comm'rs

19  v. Brown, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997); Fairley v. Luman,

20  281 F.3d 913, 916 (9th Cir. 2002) (per curiam).

21         A policy "promulgated, adopted, or ratified by a local governmental entity's

22  legislative body unquestionably satisfies Monell's policy requirement." Thompson v. City

23  of Los Angeles, 885 F.2d 1439, 1443 (9th Cir. 1989).  A "permanent or well-settled

24  practice" that gives rise to the constitutional violation may also constitute a "policy or

25  practice" under Monell.  See City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S. Ct.

26  915, 99 L. Ed. 2d 107 (1988); Menotti v. City of Seattle, 409 F.3d 1113, 1147 (9th Cir.

27  2005).  However, a single incident of a constitutional deprivation by a municipal employee

28  cannot create liability under Monell, "unless proof of the incident includes proof that it was

1  caused by an existing, unconstitutional municipal policy, which policy can be attributed

2  to a municipal policymaker." City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24, 105

3  S. Ct. 2427, 85 L. Ed. 2d 791 (1985).

4        Further, a failure to train municipal employees adequately may satisfy Monell's

5  policy requirement. See City of Canton v. Harris, 489 U.S. 378, 388-91, 109 S. Ct. 1197,

6  103 L. Ed. 2d 412 (1989); Gibson v. County of Washoe, 290 F.3d 1175, 1194 (9th Cir.

7  2002); Fairly v. Luman, 281 F.3d at 917; but see especially Board of County Comm'rs v.

8  Brown, 520 U.S. at 409-10 (discussing limited scope of such claim).  Such a showing

9  depends on three elements:  (1) the training program must be inadequate "in relation to the

10 tasks the particular officers must perform"; (2) the city officials must have been

11 deliberately indifferent "to the rights of the persons with whom the [local officials] come

12 in contact"; and (3) the inadequacy of the training "must have been shown to have 'actually

13 caused' the constitutional deprivation at issue." Merrit v. County of Los Angeles, 875 F.2d

14 765, 770 (9th Cir. 1989) (internal citations omitted).  With respect to factor (2), a

15 municipality is deliberately indifferent to a person's constitutional rights when the need for

16 more or different action is obvious and the inadequacy of the action taken so likely to result

17 in the violation of constitutional rights, that the policymakers reasonably can be said to

18 have been deliberately indifferent to the need. See Oviatt v. Pearce, 954 F.2d 1470, 1477-

19 78 (9th Cir. 1992).

20       In this case, Plaintiff makes no allegations that a custom or policy on the part of the

21 City of Torrance led to the alleged constitutional violations.  [See Cpt. 14-82.]  Nor does

22 he allege a failure to train as the moving force behind the alleged violations.  There simply

23 are no factual allegations of municipal policy, practice, or custom in the entire Complaint.

24 Accordingly, even when construed liberally, the facts Plaintiff alleges in his Complaint do

25 not provide a basis for municipal liability against the City of Torrance.  Monell,  436 U.S.

26 658, 694.  Therefore, Defendant's Motion for Judgment on the Pleadings should be granted

27 with respect to all of Plaintiff's federal claims against the City of Torrance.

28

Because Plaintiff has not met his burden to identify any of the individual Doe defendants, the federal claims should be dismissed in their entirety. Should Plaintiff identify individual officer defendants in the future, he may pursue his claims against them in a new action.

**C.   SUPPLEMENTAL JURISDICTION**

With regard to Plaintiff's remaining state law claims, these claims should be dismissed in light of the dismissal of all of his federal claims. United Mine Workers v. Gibbs ("Gibbs"), 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. .2d 218 (1966); Kelley v. International Bhd. of Elec. Workers, 803 F.2d 516, 519 (9th Cir. 1986); see 28 U.S.C. § 1367(c) (granting district court discretion to decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction).

The exercise of discretion to decline jurisdiction over supplemental state law claims pursuant to § 1367(c) is informed by the Gibbs values of economy, convenience, fairness and comity. Acri v. Varian Associates, Inc., 114 F.3d 999, 1001 (9th Cir. 1997), supplemented by 121 F.3d 714 (9th Cir. 1997). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Melon Univ. v. Cohill, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988).

In the instant case, after the dismissal of Plaintiff's federal claims, only his state-law claims will remain. It is appropriate, therefore, to decline to exercise supplemental jurisdiction over those claims.

///
///
///
///
///
///

1

## **RECOMMENDATION**

2      Accordingly, the undersigned recommends that the court issue an order:

3 (1) accepting this Report and Recommendation; (2) granting Defendants' Motion for

4 Judgment on the Pleadings; and (3) dismissing the action.

5

6      DATED:  March 18, 2009

7

8

9                                   _____

                      for STEPHEN J. HILLMAN

10                UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28